AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Indiana

**SEALED**

United States of America

v.

DARLENS RENARD, a/k/a "Los", a/k/a "Loz", -01
JASAUN POPE, a/k/a "Bizz", a/k/a "DFA" -02
PRINCESS ELIZER, -03
JENNIFER GLEMEAU, and -04
KAREEM BROWN, a/k/a "Reem", -05

*Defendant(s)*

Case No. 1:21-mj-0234-MJD

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 28, 2020 continuing to Present in the county of Marion in the Southern District of Indiana, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C §§ 1349 & 1341 | Conspiracy to Commit Mail Fraud and Mail Fraud |
| 18 U.S.C §§ 1956(h) & 1956(a)(1)(A)(i) | Conspiracy to Commit Money Laundering and Money Laundering |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

/s/ Eric S. Sills
*Complainant's signature*

Eric S. Sills, SA/IRS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by telephonic *reliable electronic means)*

Date: March 15, 2021

City and state: Indianapolis, IN

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF INDIANA

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Eric S. Sills, a Special Agent (SA) with the Internal Revenue Service-Criminal Investigation Division (IRS-CID), being duly sworn under oath, states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. **Introduction.** I make this affidavit in support of an application for a Criminal Complaint for

a. **DARLENS RENARD** a/k/a "Los" a/k/a "Loz" ("RENARD" or "LOS"), a male, date of birth XX/XX/1989;

b. **JASAUN POPE** a/k/a "Bizz" a/k/a "DFA" ("POPE"), a male, date of birth XX/XX/1990;

c. **PRINCESS ELIZER** ("ELIZER"), a female, date of birth XX/XX/1990;

d. **JENNIFER GLEMEAU** ("GLEMEAU"), a female, date of birth XX/XX/1992; and

e. **KAREEM BROWN** a/k/a "Reem" ("BROWN"), a male, date of birth XX/XX/1990;

(collectively "the Defendants")[1], for violations of 18 U.S.C §§ 1349 (Conspiracy to Commit Mail Fraud), 1341 (Mail Fraud), 1956(h) (Conspiracy to Commit Money Laundering), and 1956(a)(1)(A)(i) (Money Laundering-Promotion).

2. **Your Affiant.** Your Affiant is a Special Agent with IRS-CID. I have been a Special Agent since January 2004. In connection with official IRS-CID duties, I investigate possible criminal violations of: the Internal Revenue Code, covered under Title 26 of the United

[1] The dates of birth listed above, which are known to law enforcement, were obtained from the Defendants during traffic stops or arrests during the course of this investigation, as well as from searches of law enforcement databases, such as those that contain driver's license and vehicle registration information.

States Code; the Bank Secrecy Act, covered under Title 31 of the United States Code; the Money Laundering Control Act, covered under Title 18, United States Code, Sections 1956 and 1957; and other related offenses. I have also received specialized training regarding the investigation of various financial offenses and am familiar with some of the techniques used by individuals to avoid currency reporting requirements and launder criminal proceeds. Since approximately 2011, I have been assigned to a multi-agency Drug Enforcement Administration (DEA) task force to investigate possible money laundering and currency reporting violations, more specifically money laundering violations of Title 18, U.S.C., §§ 1956 and 1957, as well as currency reporting violations of 18 U.S.C. § 1960 and 31 U.S.C. §§ 5313, 5316, 5324, and 5330. I have participated in investigations involving individuals transporting and distributing cocaine, methamphetamine, marijuana, and heroin. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions. Prior to and including my assignment with the DEA, I have conducted and assisted in numerous types of financial crimes investigations including mail fraud, wire fraud, health care fraud, mortgage fraud and tax. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the general questioning of witnesses and defendants, the use of informants, the use of pen registers, the use of GPS/Ping location data, the execution of search warrants, and undercover operations.

3. **Sources of Information.** The information contained in this Affidavit is based on my personal knowledge, training, and experience, information that I have received from other law enforcement officers assisting in this investigation and what I have learned from the other sources specifically discussed herein. This Affidavit does not purport to set forth all of my knowledge or

investigation into this case but only that which I believe is sufficient to establish probable cause for the issuance of the Criminal Complaint.

## RELEVANT CRIMINAL VIOLATIONS

### Conspiracy to Commit Mail Fraud and Mail Fraud
### 18 U.S.C. §§ 1349 and 1341

4. Based on the facts set forth in this affidavit, there is probable cause to believe that from on or before April 28, 2020 and continuing to the present, in the Southern District of Indiana and elsewhere, the Defendants knowingly and willfully conspired with each other, and with others known and unknown, to commit Mail Fraud in violation of 18 U.S.C. § 1341, by participating in a scheme to defraud elder victims and deprive them of money or property by means of false and fraudulent representations and pretenses, resulting in victims sending significant amounts of U.S. currency by mail or commercial interstate carrier, the retrieval of which was orchestrated and performed by the Defendants. The elements of these offenses are as follows:

**18 U.S.C. § 1349 (Conspiracy to Commit Mail Fraud)**

FIRST: The conspiracy as alleged existed; and

SECOND: The defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

**18 U.S.C. § 1341 (Mail Fraud)**

FIRST: That the defendant knowingly devised or participated in a scheme to defraud, as described in the Information;

SECOND: That the defendant did so with the intent to defraud;

THIRD: That the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and

FOURTH: That for the purpose of carrying out the scheme or attempting to do so, the defendant used or caused the use of the United States Mails or a private or commercial interstate carrier to take place.

**<u>Conspiracy to Commit Money Laundering and Money Laundering</u>**
**18 U.S.C. § 1956(h) and 1956(a)(1)(A)(i)**

5. Based on the facts set forth in this affidavit, from on or before April 28, 2020 and continuing to the present, in the Southern District of Indiana and elsewhere, the Defendants knowingly and willfully conspired with each other and with others, known and unknown, to launder money derived from a specified unlawful activity, that is, mail fraud, which represented the proceeds of the elder fraud scheme described herein, part of which were used to make payments to the Defendants to promote their continued participation in the fraudulent scheme. The elements of these offenses are as follows:

**<u>18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering</u>**

FIRST: The conspiracy as alleged existed; and

SECOND: The defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

**<u>18 U.S.C. § 1956(a)(1)(A)(i) (Money Laundering)</u>**

FIRST: The defendant knowingly conducted or attempted to conduct a financial transaction;

SECOND: Some or all of the property involved in the financial transaction was proceeds of a specified unlawful activity, such as Mail Fraud;

THIRD: The defendant knew the property involved in the financial transaction represented proceeds of some form of unlawful activity; and

FOURTH: The defendant acted with the intent promote the carrying on of the specified unlawful activity, such as Mail Fraud.

## PROBABLE CAUSE

### A. Summary

6. As described herein, the Defendants conspired to, and did, participate in a nationwide scam to defraud and obtain money from elder victims. Victims received phone calls claiming that their relative, such as a grandchild, was in serious trouble and that the victims needed immediately to send money, typically in the form of U.S. currency, to the caller or the caller's purported associate to help the relative. For instance, victims received calls from a person claiming to be a criminal defense attorney for the victims' relatives who had purportedly committed a serious crime and needed money to be sent to the attorney either for legal fees or to post bond. Victims were then instructed to send a specific amount of U.S. currency, typically more than $1,000, sometimes more than $10,000, to a particular address. I will refer to this as the "grandparent/relative scam."

7. The evidence in this affidavit shows that the Defendants' role in the scam was (1) to identify locations where victims would be told to send money via interstate carrier (e.g., UPS, FedEx), typically residential addresses that appeared to be unoccupied or for sale; (2) to retrieve the packages containing the money immediately after victims shipped them; (3) to count the money received; and (4) to document, typically via video, both the counting of the money and any problems that arose while retrieving the packages, such as if the package was retrieved by someone else or if law enforcement was present. The evidence also shows that the Defendants paid and/or received a portion of the proceeds of the scam for their involvement in it, thus promoting the continuation of the scam throughout 2020 and 2021.

8. The evidence shows that the Defendants traveled to cities throughout the United States to carry out the scheme, typically spending approximately one week in a particular location

before moving to another city. Between approximately August 16-20, 2020, the Defendants carried out their scheme in Indianapolis, Indiana, which is in the Southern District of Indiana. In the affidavit that follows, I begin describing the evidence pertaining to the Defendants' activities in Indianapolis. I next summarize the evidence that shows that the Defendants participated in the scheme in at least nine (9) other cities both before and after their time in Indianapolis. Finally, I summarize and provide examples of evidence of the Defendants' use of proceeds of the grandparent/relative scam to promote the scheme, namely by using a portion of the proceeds to pay POPE, GLEMEAU, ELIZER, and SMITH, along with their costs of travel and lodging.

**B. Scam Activity in the Southern District of Indiana**

***Tip Regarding Victim from Massachusetts***

9. On August 19, 2020, Detective Sergeant Scott Brimer of the Indianapolis Metropolitan Police Department Metro Drug Task Force ("IMPD") received a tip from an Officer Neill Bohlin of the Orleans Police Department in Orleans, Massachusetts, regarding Victim C.C., an 81-year-old victim of a scam. Sgt. Brimer interviewed Victim C.C., who relayed that she had recently received a phone call from an individual purportedly named "David Heinz," who claimed that Victim C.C.'s grandniece had been involved in a car accident. Heinz provided some details about the purported accident, including that the other vehicle had children in it who were also badly injured. The purported Heinz further told Victim C.C. that her grandniece was in legal trouble, and that he needed $9,000 to help pay for her grandniece's medical care and legal assistance. Victim C.C. agreed to send the money, and Heinz told her to send it in cash to a "Charles Heigs" at 2755 N. Tacoma Avenue, Indianapolis, Indiana. Victim C.C. sent the money via UPS, which was scheduled to arrive on the morning of August 18, 2020.

10. Victim C.C. further relayed to Sgt. Brimer that on August 18, 2020, at 10:00 a.m., Victim C.C. received another phone call from the purported Heinz stating that the cash was received and that the case for her grandniece was going well. Heinz also told Victim C.C. that she needed to send another $9,000 in cash to the same address, and she agreed. However, around the same time, Victim C.C. made contact with her grandniece and learned that she had not been in a car accident and that Heinz's story was false.

11. Victim C.C. contacted the Orleans Police Department. Ofr. Bohlin instructed Victim C.C. to send another package overnight to the same address, but instead to fill the package only with magazines to match the weight of a package filled with cash. Victim C.C. did so, and sent it UPS Next Day Air early delivery. Ofr. Bohlin, as noted above, contacted IMPD.

***Surveillance of Package Delivery and Interview of Individuals Picking Up Package***

12. Having received this information about the package delivery from both Ofr. Bohlin and Victim C.C., Sgt. Brimer and other IMPD officers conducted surveillance during the morning of August 20, 2020 at the residence located at 2755 N. Tacoma Ave., Indianapolis, Indiana (the address to which Victim C.C. sent the package). The residence appeared to be unoccupied due to no vehicles in the driveway or parked on the street and all the blinds being closed. The residence also had a realty sign in the front yard indicating it was for sale or rent. A Google search of the property indicated it was for sale and had an offer pending.

13. A gray Nissan Rogue bearing Georgia license plate number CK111794 was seen driving past the residence several times. Officers then observed UPS deliver a package to the residence, placing it on the front porch. Minutes later, the Nissan Rogue drove past the residence again, circled back around, and came to a stop in front of the house. The vehicle had two

occupants. Officers observed the driver exit the vehicle, take the package from the porch of the residence, place it in the rear hatch of the vehicle, and get back in and drive away.

14. IMPD Sgt. Paul McDonald followed the vehicle for several minutes before stopping the vehicle on probable cause that a crime had been committed by the driver retrieving the package from the front porch of the residence. The driver was identified as GLEMEAU, who produced a Maryland driver's license, and the passenger was identified as ELIZER, who produced a Georgia driver's license. Sgt. McDonald read them their rights pursuant to *Miranda v. Arizona* ("*Miranda* Rights") and asked about taking the package. They both stated that they were in town looking for houses to buy, and they saw the package on the porch and decided to steal it.

15. Both were arrested and transported to IMPD North District for further questioning. Their phones were confiscated and eventually searched pursuant to a search warrant issued under S.D. Ind. Cause No. 1:20-mj-0785 (referred to as "GLEMEAU's Phone" and "ELIZER's Phone"). Each was interviewed separately and stated they had been read their *Miranda* Rights and understood them:

a. At first, each again stated they were in Indianapolis looking at houses for sale. They each stated they were using an app called "Driving for Dollars" to find properties for sale and then try to find investors to purchase them.

b. ELIZER again stated that they saw the package on the porch and decided to steal it.

c. GLEMEAU initially gave the same statement as ELIZER but then stated that ELIZER had asked her if she wanted to pick up packages with her to make some extra money and she (GLEMEAU) agreed. GLEMEAU stated that ELIZER would receive a text directing them to house where a package was going. They would then pick up the

package and get another text instructing them where to drop it off. GLEMEAU stated that this is what they did at the residence where IMPD had observed them. GLEMEAU stated it was the first time she had picked up a package with ELIZER. GLEMEAU further stated she knew it was wrong to take the packages but did not know what was in them.

d. During this interview with GLEMEAU, Sgt. Brimer informed GLEMEAU that there were a lot of victims in this case and that their life savings had been taken, and that they are real victims and real people.

e. GLEMEAU said they were staying in Indianapolis at an AirBnB but did not know the address. She gave officers permission to unlock her cell phone and helped them locate the address of the AirBnB, which officers learned to be 1103 Sterling Street, Indianapolis, IN.

16. Their vehicle was seized for forfeiture and inventoried pursuant to IMPD policy. During the inventory, IMPD located approximately 20 pre-paid credit/debit cards, hotel key cards, Air BnB hotel cards, and a LG cellular phone model LM-X220MB. I know in my training and experience that illegal proceeds obtained in the form of bulk cash are often converted into prepaid debit cards, or gift cards as a way of concealing the source of the proceeds, making it less suspicious, and making it easier to transport and transfer electronically.

***Search of 1103 Sterling Street, Indianapolis, Indiana***

17. On August 20, 2020, Sgt. Brimer applied for and obtained in Marion County Superior Court a search warrant for the residence located at 1103 Sterling Street, Indianapolis, IN, consistent with where GLEMEAU's Phone showed them to be staying. IMPD executed the warrant and conducted the search of that residence on August 20, 2020.

18. Detectives established surveillance at 1103 Sterling Street while waiting for the warrant to be issued. IMPD Det. Wininger observed an individual later identified as Brandin Smith ("Smith") exit the residence and stand on the front porch. GLEMEAU had informed detectives that Smith was the father of her 5-month-old child, and they were all staying at 1103 Sterling Street. Det. Wininger made contact with Smith and detained him pursuant to the investigation. While in the house, detectives conducted a protective sweep of the residence and discovered POPE in the upstairs bedroom. POPE was also detained pursuant to the investigation. Sgt. Brimer read POPE and Smith their *Miranda* Rights, and both stated that they understood.

19. During a search of the residence detectives located, among other things, the following items pertaining to the scam described above:

a. A fanny pack found in the room where POPE was staying, containing, among other things, $8,360 in U.S. currency.

b. Several cellular telephones and computers, including two phones found in POPE's bedroom, one of which was found to be assigned telephone number (516) 262-1380 ("POPE's Phone").

c. A crumpled-up piece of paper on the ground outside of POPE's bedroom window containing seven addresses located throughout Indianapolis, Indiana. Officers were later able to determine that six of the addresses pertained to packages by potential fraud victims: 2755 N Tacoma (the address to which Victim C.C., the Massachusetts victim, sent packages), 3616 N. Illinois, 2933 Draper St., 211 East Westfield, 5827 E 75th St, and 5815 E 75th St. Also, a handwritten list of nine addresses, several of which had times and check-marks written next to them, was found in the kitchen trashcan by IMPD Detective Scott Wolfe.

d. The following three packages were found in ELIZER's room, all of which had labels with recipient addresses that were listed on the crumpled-up piece of paper found outside POPE's window, and two of which were listed on the other handwritten list found in the kitchen:

(1) A package sent by Victim S.A. with the delivery address of 211 East Westfield containing $7,000.

(2) A package sent by Victim B.T. with the delivery address of 5827 E 75th St. containing $5,000.

(3) A package sent by Victim S.H. with the delivery address of 5815 E 75th St. containing a rock. This package appeared to have been re-taped.

e. Two notebooks found in the bedroom shared by Smith, GLEMEAU, and their child. One notebook appeared to contain notes about buying and selling houses and contained the name "Princess" in one of the written sales pitches. Based on my understanding of this investigation, I understand "Princess" to be referring to ELIZER. (Among other things, "Princess" is ELZIER's first name.) The other notebook, which had different handwriting, contained lists of addressed with notes including "good" or "bad". Some of the addresses matched those on the two handwritten lists, mentioned above.

20. POPE, ELIZER, and GLEMEAU were arrested on State of Indiana fraud/theft charges and transported to the Marion County (IN) Jail for processing. ELIZER and GLEMEAU subsequently bonded out a few days after their arrest. Formal charges were ultimately not filed against ELIZER and GLEMEAU. POPE was held on an extraditable warrant for elder fraud and failure-to-appear charges out of Sumner County, Tennessee.

***Contact with Additional Victims***

21. IMPD officers contacted the senders of the packages found during the search of 1103 Sterling Street or that UPS personnel identified to law enforcement as being in the process of being delivered to addresses in Indianapolis:

a. **Victim S.A. (package containing $7,000):** On August 20, 2020, Det. Wolfe spoke with Victim S.A., one of the individuals whose package was found inside 1103 Sterling Street (the one containing $7,000 in U.S. currency). Victim S.A. reported that he was 86 years old and lived in Greenville, S.C. Victim S.A. stated that he received a call from an individual purporting to be an attorney who stated that S.A.'s grandson, who was out of the country, damaged property and needed $7,000 to fix it. The individual told him to send the money to an address in Indianapolis, which Victim S.A. did.

b. **Victim B.T. (package with $5,000):** On August 20, 2020, Det. Wolfe spoke with Victim B.T., approximately 82 years old, of Crawfordsville, Indiana, one of the individuals whose package was found inside 1103 Sterling Street (the one containing $5,000 in U.S. currency). Victim B.T. stated that she received a call from an individual purporting to inform her that her daughter was in an accident and a firearm was found in her daughter's vehicle. As with previous victims, she was told money was needed. She was also told there was a "gag order" in place, which subsequent investigation showed was an effort by the scammers to prevent victims from talking with others about the scam. Victim B.T. stated that she sent two packages via UPS to addresses in Indianapolis, one on August 17, 2020 containing $7,500 in U.S. currency, and another on August 19, 2020 containing $5,000 in U.S. currency.

c. **Victim S.H. (package containing the rock):** On August 20, 2020, Det. Wolfe spoke with Victim S.H., approximately 82 years old, one of the individuals whose package was found inside 1103 Sterling Street (the one containing a rock). Victim S.H. said he received a call purporting to inform him that his granddaughter had been in an accident involving a police officer and that he needed to send money to a purported attorney. Victim S.H. stated that he sent two packages to 5815 E. 75th St., Indianapolis, Indiana one on August 17, 2020 containing $10,000 in U.S. currency, and another on August 18, 2020 in U.S. currency containing $9,000 and a rock. Victim S.H. also stated he sent a package on August 20, 2020 to 7331 Shelbyville Rd. containing $7,500 in U.S. currency. (Detective Wolfe advised him to get the last package recalled, which he did.)

d. **Victim K.K.:** This package was intercepted by UPS prior to delivery to 3616 N. Illinois Street. Sgt. Brimer determined that the sender, Victim K.K., approximately 66 years old, resided in Rhode Island. Sgt. Brimer learned that Victim K.K. was unavailable due to a health condition, but was able to speak with P.D., a relative of Victim K.K. P.D. stated that she (P.D.) was the one who talked on the phone to an individual who requested money. P.D. said she was directed to pack U.S. currency inside magazines, put the magazines inside a package, and mail the package. She was able to describe the package accurately and gave UPS security personnel, Andrew Downer, permission to open the recovered package. Mr. Downer found to contain the magazines and $4,000 in U.S. currency. The contents of the package including the U.S. currency were re-packaged by Mr. Downer and sent back to P.D.

e. **Victim A.T.:** This package was intercepted by UPS prior to delivery to 2933 Draper Street. Sgt. Brimer determined that the sender, Victim A.T., approximately

80 years old, who resided in New York. Sgt. Brimer made contact with Victim A.T., who stated that he believed he was sending $16,000 to pay a bondsman for his grandson. Sgt. Brimer opened the package, after receiving Victim A.T.'s consent, and confirmed that it contained the $16,000 in U.S. currency. The contents of the package including the U.S. currency were re-packaged by Mr. Downer and sent back to Victim A.T.

***Other Packages of Cash Mailed to the Southern District of Indiana***

22. During the search of 1103 Sterling Street, detectives located paperwork for BROWN pertaining to a red-light safety camera violation in Nassau County, New York. When questioned during the search, POPE and Smith had stated that a male nicknamed "Reem" had been staying with them. (BROWN's first name is "Kareem.")

23. During the interview of ELIZER at the time of her arrest, officers observed that ELIZER's cell phone received several calls, which went unanswered. The name on the phone, which was visible, indicated the calls were from "Reem". Sgt. Brimer asked ELIZER who "Reem" was and she said it was a guy she was "talking to", or dating, who calls her all the time. GLEMEAU's cell phone also received several unanswered calls from telephone number (516) 760-7235 ("BROWN's Phone") during the interviews.

24. During the execution of the search warrant at 1103 Sterling Street, while detectives were standing on the front porch, a white Hyundai Elantra with Virginia plate VJX2756 slowly drove by the residence looking at the detectives. IMPD officers followed the vehicle as it pulled into a parking lot on 10th St. Officers approached the vehicle and confirmed it was in fact BROWN. Officers then transported BROWN back to 1103 Sterling Street and read him his *Miranda* Rights, which he stated he understood. BROWN said he had seen ELIZER and GLEMEAU at the AirBnB but did not know them. He also stated his telephone number was (704)

560-7235— similar to, but slightly different from, the one that officers saw calling GLEMEAU's phone. POPE, BROWN, and Smith denied knowing anything about the packages and stated they all just came to Indianapolis for a vacation. BROWN was not arrested at that time.

25. The next day, August 21, 2020, Det. Brian S. Stewart, Sr. of the Plainfield Police Department, received information from a shipping company regarding a package that had been taken off the front porch of a residence. The owner of the residence had a doorbell video that showed an individual approaching the front door, lightly knocking on the door, and then picking up the package and leaving. The video was provided to Det. Stewart.

26. When Det. Stewart received the video, Det. Stewart observed a white vehicle parked out front of the residence. The vehicle appeared to be the same vehicle that BROWN was driving on August 20, 2020. Det. Stewart then observed an individual walk up to the front porch while talking on his cellphone. The individual stopped, bent over to tie his shoe, then proceeded to the door where he lightly knocked on the door. After standing at the front door for a couple seconds, the individual bent over, picked up a package, stuffed it in the front of his pants, and covered it over with his jacket. The individual then walked back out to the white passenger car and left. After watching this video, Det. Stewart recognized the individual as BROWN based on his observations of BROWN during his interview with officers at the AirBnB the day before. Additionally, the hat that the individual was wearing matched the hat that BROWN was observed wearing on August 20, 2020.

27. At this point, IMPD officers and Det. Stewart surveilled the area of 1103 Sterling Street where the above-described search had occurred the day before. Det. Stewart observed the white Hyundai Elantra pull onto and park on Sterling Street and BROWN exit the driver's seat. Det. Stewart immediately noticed BROWN had on the same jacket and hat that the individual in

the doorbell video had on. Det. Stewart detained BROWN and advised him of his *Miranda* Rights, and BROWN advised Det. Stewart that he understood and would speak with him. BROWN stated that the vehicle he was driving had been rented by ELIZER. BROWN stated that another male subject named "Antwan" had told him he would pay him $50 to go up and knock on doors to see if anyone was home and if there was a package on the porch to grab it and he would get paid an additional $50 for getting the package. BROWN stated several times that he did not know what was in the package, but that he had retrieved it and given it to Antwan. BROWN stated that Antwan opened the package and it appeared to just have a magazine and a couple white papers inside of it.

28. **Victim K.L.** The shipping company sent Det. Stewart information regarding the sender of the package, which was identified as 76-year-old Victim K.L. from Michigan. Det. Stewart contacted Victim K.L., who advised that he had sent the package on August 20, 2020 and that the package contained U.S. currency totaling $14,000. Victim K.L. further stated that he had received a telephone call from a subject advising that he was an attorney representing their nephew, and that their nephew had been involved in an accident. Victim K.L. stated that the "attorney" had called him several times and requested money to be sent to him for the hospital bills for the victim and that they had sent a total of $70,000 in US currency to addresses in Florida, Ohio, and now Indiana. (Additional information regarding the package sent to the Ohio address is described later in this Affidavit.)

## C. **Search of Electronic Devices from 1103 Sterling Street**

29. As noted above, a search warrant was issued in the Southern District of Indiana under cause number 1:20-mj-0785, authorizing law enforcement to search the content of the electronic devices seized by IMPD officers from GLEMEAU and ELIZER and from 1103 Sterling

Street on August 20, 2020, including a cellular phone possessed by GLEMEAU and phones located in POPE's bedroom.

***Background: Identification of RENARD as "Los" and POPE as "Biz"***

30. Previously, on or about August 29, 2019, Cooperating Defendant 1 ("CD-1")[2] provided information to members of the New York Police Department (NYPD). CD-1 stated that he/she attended school with POPE and identified a photograph of POPE. POPE asked CD-1 if he/she wanted to make some money. Because CD-1 was not of Haitian decent, POPE stated that CD-1 would have to meet POPE's boss, who was identified as "Los". CD-1 stated that he/she met Los on several occasions while being vetted to work for POPE and LOS' group. During the interview, CD-1 was shown a photograph of RENARD, whom CD-1 positively identified as "Los".

31. CD-1 stated that he/she (CD-1) would communicate with POPE over an encrypted cellular telephone application, though he/she could not recall the name of the application. CD-1 stated that, on the application, RENARD's username was "Los" and POPE's username was "Pope Biz".

32. As described below, CD-1's information regarding POPE and RENARD, and that they are identified as "Biz" and "Los," respectively, is corroborated by other information learned through this investigation, including written communications among the Defendants.

***Devices Show Pattern of Communications about Scheme and Activity in Indianapolis***

33. Evidence of Application A [application name redacted] ("App A") was present on several of the devices. App A is an encrypted messaging and voice-over-IP software application

---

[2] CD-1 was arrested on March 10, 2019 by the New York Police Department for Elder Fraud while picking up money. When he/she was arrested, CD-1 stated that was the first time he/she picked up money.

that can be used on cellular phones. Forensic analysis of the phones showed at least two long-running text message conversations on App A pertaining to the above-described scheme.

a. One of the conversations, which was found on GLEMEAU's Phone, appears to involve POPE (identified as "Bizz," consistent with CD-1's report) at a number consistent with POPE's Phone, GLEMEAU (identified as "Jennay") at a number consistent with GLEMEAU's Phone, ELIZER (identified as "Princess") at a number consistent with ELIZER's Phone, BROWN at a number consistent with BROWN's Phone, and Smith. The text messages in this conversation were sent and received during approximately July 21, 2020 to August 20, 2020.

b. The second conversation, found on a phone seized from POPE's bedroom at 1103 Sterling Street, appears to involve only POPE (identified as "DFA" or "Stan") at two different numbers at various points including one that is consistent with POPE's Phone, and another user identified as "Loz" (RENARD). The text messages in this second conversation were sent and received during approximately July 28, 2020 to August 20, 2020. In one of the first text messages from the user identified as "DFA," the user identified himself by writing, "This Bizz."

34. In general, based on my and other investigators' review of the two App A conversations, along with my knowledge of this investigation to date, I believe the App A conversations show that the Defendants' engaged in following pattern of activity with respect to their role in the grandparent/relative scam: (1) POPE, GLEMEAU, ELIZER, and others arrive in a city and rent lodging; (2) they then collect a list of dozens of addresses throughout the city, typically residences that are unoccupied or for sale, which POPE then sends to RENARD; (3) a day or so later, RENARD sends POPE shipping information relating to packages expecting to

arrive at certain of those addresses, including the to/from shipping information and the tracking number; (4) POPE also sends the addresses and expected delivery times to GLEMEAU, ELIZER, and others, who report back as to their efforts to retrieve the packages, including whether UPS or FedEx dropped off the package, whether they picked it up, and whether law enforcement was in the area; (5) POPE reports back to RENARD in real-time as to whether the packages have been picked up, and RENARD also reports as to whether packages have been delivered (presumably using the tracking numbers) and generally gives instructions on how to proceed, which POPE relays to GLEMEAU, ELIZER, and others; and (6) RENARD travels to the city where POPE and the others are located to collect money and pay POPE and the others from the proceeds.

35. The following illustrates the above sequence of events, using the Defendants' time in Indianapolis as an example:

a. On or about August 15, 2020, GLEMEAU sent a message via App A to the group conversation with POPE stating the address of "1103 Sterling Street, Indianapolis, IN 46201." As described above, 1103 Sterling was the address of the AirBnb searched by IMPD on August 20 and was where POPE and the other Defendants were located. Several seconds later, POPE replied "got a list?" to which GLEMEAU replied "coming soon." Based on my understanding of this investigation, "a list" meant addresses of unoccupied residences where packages of cash could be sent.

b. On or about August 16, 2020, ELIZER sent the App A group conversation a list of approximately 25 addresses, and the group continued to discuss finding more addresses. At one point, POPE provided an "incentive" that if they "get the 60 for sure by 10 [you all] get a extra 25 on they packs". Based on my training and experience, and the information learned through this investigation, I believe that "60" refers to the number of

addresses of unoccupied residence, which is more than the 30-50 addresses they typically seek to identify. Further, I believe that "extra 25" refers to extra money paid to the Defendants from the proceeds of the scheme (i.e., the cash contained in the packages).

c. Later that day, POPE reported to RENARD via separate App A conversation that they "got 32", to which RENARD replies, "OK keep going plz". Around three hours later, Pope replies, "Got 60" and then sends RENARD a list of approximately 60 Indianapolis addresses, including the seven addresses found written on the crumpled paper outside of POPE's window during the search of 1103 Sterling Street.

d. On or about August 17, 2020, and over the next two days, RENARD sent POPE a series of messages relating to specific addresses from POPE's list of 60, along with to/from shipping information and tracking numbers relating to FedEx and UPS shipments. That included information for all seven of the addresses found on the crumpled paper. Notably, the to/from information and tracking numbers provided by RENARD largely aligned with information obtained from the individual victims who were contacted by law enforcement, including the name of Victim C.C. (the Massachusetts victim) and the address to which his/her package was sent (and where GLEMEAU and ELIZER were arrested). (Any differences in the information from the victims and the information from RENARD were primarily due to spelling.) None of the names of package recipients were the Defendants' names.

e. A forensic examination of POPE's phone found at 1103 Sterling Street containing communications on App A between POPE and RENARD showed that the phone had been used on or about August 17-19, 2020 to access shipment tracking information from the UPS website. The tracking numbers searched matched many of the

tracking numbers that RENARD sent to POPE along with the addresses, including the tracking number for Victim C.C.'s package.

f. Shortly after receiving the addresses from RENARD, POPE sent the addresses via the App A group conversation to GLEMEAU, ELIZER, and others, along with a time for each address. Throughout the day, GLEMEAU and others reported back to POPE on their status (e.g., "circling", "just saw it [the package] drop", "we 10 min away from the other 8am") and asking questions about individual packages (e.g., "ups?", "did the other 4 addy's [addresses] update"). Also, POPE sent status updates to RENARD (e.g., "8960 dropped", "they circling", "7644 had no delivery time all morning n it jus updated said it dropped 10.30 reem [BROWN] 10 min away").

g. Lastly, on or about August 18, 2020, phone evidence and other evidence showed that RENARD traveled to Indianapolis to meet the rest of the Defendants. The phone showed that RENARD asked POPE via App A message, "Can yall pick me up from the airport at 1030 american". RENARD identified his flight number as "Aa4474". RENARD also said, "Ill go to urs for count", which based on the investigation to date, I believe is a reference to RENARD and POPE meeting at POPE's location to count and collect the consolidated proceeds of the fraud. Shortly thereafter, POPE sent an App A group message to GLEMEAU, ELIZER, and others: "anybody wanna scoop Los from the airport at 10.30[.] It's 23 min away". Later, at around 10:30, RENARD told POPE, "Just touched down . . . . Door 5".

(1) A grand jury subpoena was issued to American Airlines for records related to American Airlines flight 4474 arriving in Indianapolis International Airport on August 18, 2020. Those records were reviewed by investigators and it

was found that RENARD flew on American Airlines flight 4474 from Miami International Airport to Indianapolis International Airport on August 18, 2020, arriving at 10:23 p.m.

(2) The flight records contained a cellular phone number for RENARD. Historical cell site data obtained via search warrant for that number showed that, from approximately August 19, 2020 to August 21, 2020, the phone was located in Indianapolis, Indiana.[3]

* * *

36. Based on the foregoing, I submit there is probable cause to believe that the Defendants executed their role in the fraud conspiracy in Indianapolis, Indiana, by identifying addresses to which victims were instructed to send U.S. currency, retrieving packages of U.S. currency sent by victims, and collecting and counting the currency, all the while attempting to avoid detection by law enforcement. All of which was in violation of 18 U.S.C. §§ 1349 and 1341.

**D. <u>Scam Activity in Other States Before and After Activity in Indianapolis</u>**

37. The Defendants did not operate only in Indianapolis. The investigation showed that the Defendants traveled to other cities and states during 2020 and early 2021 to perpetrate the fraud scheme, both before and after their time in Indianapolis. That evidence includes (a) App A messages and other communications obtained from cellular phones seized from the Defendants at various points, including additional messages from the two App A conversations described above, which show similar activity in different cities in late July and August 2020; (b) other data obtained

[3] The American Airlines records showed that the phone number RENARD gave for the reservation ("RENARD's Phone"). Subscriber records for the phone show it to be registered to RENARD. Also, the American Airlines records further showed that RENARD had booked over 10 airline tickets for travel to various locations in addition to Indianapolis. The earliest of these tickets was for travel on or about March 31, 2019, and the latest was for travel on or about October 19, 2020. On each of those occasions, the contact number provided was the one consistent with RENARD's Phone.

from the Defendants' cellular phones, such as videos showing individuals opening packages and counting significant amounts of U.S. currency; (c) physical surveillance of some of the Defendants retrieving packages from residential addresses; (d) seized packages, some containing U.S. currency, that were shipped to various locations consistent with what was observed in Indianapolis; (e) cellular phone location data for phone numbers known to belong to certain of the Defendants showing those individuals in or around cities where fraudulent activity took place[4]; (f) law enforcement contact with additional victims; and (g) law enforcement interviews with certain of the Defendants.

38. To illustrate the Defendants' repeated efforts to perpetrate the fraud conspiracy, the following paragraphs summarize evidence of the Defendants' activity in certain locations during 2020 and 2021. These paragraphs do not contain all of the evidence, or all of the locations, but rather that evidence and those locations sufficient to show probable cause that the Defendants participated in a nationwide elder fraud scam that involved conduct in addition to—but consistent with—the conduct they committed in the Southern District of Indiana.

***April 29-30, 2020 – Springfield, Illinois***

39. During this investigation, I learned that the U.S. Drug Enforcement Administration conducted an investigation regarding four packages sent to unoccupied residences in the Springfield, Illinois area during approximately April 29-30, 2020. I spoke with DEA Special Agent Joseph Green and reviewed his reports regarding this investigation. I learned that UPS representatives had alerted DEA that the four packages sent to Springfield area addresses were found to be undeliverable because the residences appeared unoccupied. UPS representatives

[4] Investigators have obtained search warrants for location information for various cellular devices, including RENARD's Phone (Cause Nos. 1:20-mj-1045 and 1:21-mj-0126), POPE's Phone (Cause No. 1:21-mj-0055), and ELIZER's Phone (Cause No. 1:21-mj-0101).

opened the packages and found significant amounts of U.S. currency inside. DEA agents identified who they believed were the senders of three of the four packages from shipping information, social media, public records searches, and interviews with two of the individuals. One of the senders was approximately 85 years old; another was approximately 81 years old; and the third, Victim E.L., was approximately 74 years old.

40. Victim E.L., who was interviewed, told law enforcement that after receiving a call consistent with the grandparent/relative scam described above, he and his wife sent a package containing $8,000 in U.S. currency to an address in Springfield, Illinois. Victim E.L. further reported receiving another similar call shortly thereafter and sending another $12,000 in U.S. currency to an address in Florida.

41. On April 30, 2020, investigators re-wrapped the package sent by Victim E.L. (after removing the currency) and, in an undercover capacity, delivered it to the intended address in Springfield, Illinois. Within approximately 30 minutes, investigators observed a silver Jeep pull up. A male exited the front passenger seat, retrieved the package from the front porch, and got back in the car, which drove away. Investigators followed and eventually conducted a traffic stop on the vehicle. The driver was identified as ELIZER, who provided her telephone number as the number consistent with ELIZER's Phone. Investigators learned that the vehicle had been rented a few days before from an Avis Rental Car in Georgia by GLEMEAU. During the interaction, an officer also observed a prescription bottle in the vehicle in the name of GLEMEAU. During an interview, ELIZER stated that GLEMEAU was her best friend. When asked about the package, ELIZER stated she did not know that money was contained in the package.

42. Historical cellular location data for RENARD's Phone showed that on or about April 30, 2020, the phone was located near Litchfield, Illinois, approximately fifty (50) minutes, by car, south of Springfield.

***May 16, 2020 – South Carolina (and Virginia Beach, Virginia)***

43. During the investigation, I learned that RENARD was pulled over during a traffic stop in Sumter County, South Carolina, on or about May 16, 2020. RENARD, who can be seen in a police dash camera video wearing a gold-colored bracelet, denied having any drugs, guns, or large amounts of currency inside the vehicle. Following a narcotics dog alert, the vehicle was searched. During the search, law enforcement located a gray safe inside a black bag in the rear of the vehicle. Inside the safe, officers located approximately sixteen stacks of banded $100 bills. RENARD stated that the total amount of currency was approximately $155,000. Originally, RENARD claimed the currency as his, but later, he claimed that only $5,000 belonged to him and that the remaining funds were not his but that he was responsible for them ($150,000). RENARD stated that the currency came from his business, but he was unable to provide a receipt. Also located in the vehicle were a pair of black gloves and a red box cutter. On RENARD's person and throughout the vehicle, law enforcement recovered and seized approximately six cellular devices.

44. A search warrant was obtained to review of the contents of the seized cell phones. On one of them, investigators found a series of videos that show an individual wearing a gold-colored bracelet in what appears to be a hotel room opening and recording the details of three FedEx packages. The file properties show the dates of the videos as May 15, 2020, the day before RENARD was stopped in his vehicle. The individual can be seen wearing black gloves and using a red box-cutter to open the packages, like those found in RENARD's vehicle. The videos show

each of the three shipping labels, which are addressed to locations in or around Virginia Beach, Virginia. Inside each of the packages was a significant amount of U.S. currency, which the individual can be seen counting. In two of the three packages, the currency was found tucked inside magazines, as had been the case with at least one of the packages intercepted in Indianapolis.

45. Because the video was found on one of the cellular devices located in RENARD's vehicle, as well as the fact that black gloves and a matching red box-cutter were used in the videos, and RENARD wearing a gold-colored bracelet during the traffic stop, I believe the person recording and opening the packages in the videos is RENARD.

***July 21-24, 2020 – Virginia Beach, Virginia***

46. A review of the App A group conversation, discussed above, showed a pattern of messages similar to those pertaining to activity in Indianapolis. For example, App A messages dated between July 21 and 24, 2020, show a user "Bizz" (POPE) sending messages to the group with list of addresses that, based on Google searches of those addresses, were located in the Virginia Beach, Virginia area. Like the messages pertaining to Indianapolis addresses, POPE's messages also contained times, typically in the morning. In response, other users such as "Jennay" (GLEMEAU) and "Princess Tabzz" (ELIZER) replied that they would "take" various addresses. They would also ask POPE whether the address and time were "fedi" or "UPS". Later, they would ask POPE for more "Addys", to which POPE would reply with a list of more addresses and times.

47. Based on information learned throughout the course of this investigation, including the evidence pertaining to the Indianapolis activity described above, I believe the list of addresses and times from POPE were the locations and times of package deliveries, which GLEMEAU and ELIZER agreed to retrieve. Further, I believe the questions regarding "fedi" or "UPS" referred to

whether the package was to be delivered by FedEx or UPS. And, I believe the requests for more "addys" were requests for POPE to send more addresses and times to retrieve packages.

48. Historical cellular location information for RENARD's Phone shows the phone located in and around Virginia Beach, Virginia from approximately July 22-28, 2020.

***July 28-August 2, 2020 – Roanoke, Virginia***

49. A review of the App A group conversation, discussed above, showed the Defendants then moved to Roanoke, Virginia on or around July 28, 2020. The messages showed the same pattern of activity of exchanging addresses, which Google searches showed were located in or around Roanoke. The messages included names of a package sender and recipient, a package tracking number, an address, and POPE directing the others to go to a certain location.

50. In one exchange, GLEMEAU, ELIZER, and POPE discussed a package that, based on my experience in this investigation, was not found at the intended address. GLEMEAU sent photos of the front porch, which did not show the package. ELIZER confirmed they had checked the mailbox and back entrance. In response, POPE asked them to take a "clear and sturdy" video that shows "the street sign[,] the number on the house[,] and show clearly where you are looking." Based on my experience with this investigation to date, I believe POPE was instructing his team to clearly document, via video, when a package is not found at the expected address, as a form of proof to others participating the grandparent/relative scam that POPE's team did not steal the package and the currency inside. For example, my belief is based on an August 13, 2020 exchange on App A between POPE and RENARD discussing a missing package, during which RENARD described it as a "loss," stated "they don't care" in response to POPE's attempt to explain, and stated that he (RENARD) was "eating the loss." In response, POPE stated, "I don't get it bro niggas dead [did] do the right thing n niggas talking bout we stealing." RENARD replied,

"Be[c]ause the pac[k] went missing [next message] And its happennong [sic] often." To which POPE replied, "Its video bro it's a crib niggas didn't drop at earlier in the week already why would niggas lie." Finally, RENARD replied, "Bro I understand that [next message] But that's the reaction . . . . We lose more packs than anybody bro . . . They tryuna find another team and close up shop."

51. Later, on or about July 28, 2020, POPE wrote to the group: "Need to take one to meet Los [RENARD] to cash out." A review of the contents from POPE's cellular telephone showed three video recordings, dated July 28, 2020, of a man recording another man opening packages with a type of silver knife or box-cutter and counting U.S. currency. The two individuals' faces are not visible—similar to the videos on RENARD's Phone from May 15, 2020. The shipping labels attached to all three packages showed that they were addressed to locations in Roanoke. In one of the videos, after one of the individuals finishes counting the currency taken from a package, he asks the person filming the process to confirm if he had just counted "86" or "66," to which the individual filming responds, "66." Based upon the investigation to date, I believe he was confirming the amount of money as $6,600. Finally, in all three videos, the individual opening the packages and counting the currency is observed on the videos wearing a gold bracelet on his right arm, similar to the one worn by RENARD which was captured on video on or about May 15, 2020, referenced above.

52. During this investigation, Sgt. Brimer spoke with Victims E.H. and D.H., approximately 85 and 81 years old, respectively, of Hurst, Texas, who reported that, after receiving a call consistent with the grandparent/relative scam described above, on or about July 27, 2020, they sent $9,000 in U.S. currency to an address in Roanoke, on or about July 28, 2020, and after receiving another scam call, they sent another $9,000 in U.S. currency to an address in Roanoke.

53. Historical cellular location information showed that POPE's Phone was located in and around Roanoke, Virginia from July 28-31, 2020; ELIZER's Phone from July 28, 2020 to August 2, 2020; and RENARD's Phone from July 29, 2020 to August 1, 2020.

***August 3-8, 2020 – Starkville, Mississippi***

54. A review of the App A conversations showed the group then moved on to Starkville, Mississippi on or around August 3, 2020. The App A conversations again showed a similar pattern of communication involving POPE receiving addresses and shipping information from RENARD for shipments to the Starkville area, relaying that information to the others (e.g., GLEMEAU and ELIZER) to retrieve the packages from the addresses, and GLEMEAU and ELIZER responding with status reports on those efforts.

55. Those conversations referenced shipping information also obtained by law enforcement from victims of the grandparent/relative scam. During the investigation, I received police reports from the Starkville Police Department in Starkville, Mississippi, relating to interviews with four individuals who claimed they, or their elderly relative, were victims of a grandparent/relative scam in which they were told to send between $7,500 to $14,500 of U.S. currency to addresses in Starkville. Each of the four addresses and three of the four senders and/or recipient names were contained in messages in the App A conversation between POPE and RENARD found on POPE's phone seized in Indianapolis. (The fourth had a recipient name that differed from the recipient name provided by the victim.)

56. In addition, the App A conversations included messages regarding police activity relating to one of the packages. On the morning of August 4, POPE sent a message to RENARD "police seized." RENARD immediately replied: "Ok . . . Careful." One minute later, POPE sent messages to the group: "4754 got seized by the boys . . . So make sure y'all keep ur eyes open,"

to which GLEMEAU and ELIZER replied "copy" and another user on the group conversation replied "stay safe." Based on my training and experience, and experience in this investigation, I believe POPE's reference to "the boys" referred to the police.

57. Later, POPE relayed instructions from RENARD regarding what to do if they see police officers:

> Just an FYI u guys..
>
> when/if u see police or are approached by them AUTOMATICALLY start to record.. try to be discreet if u are approached but with out a doubt if u see them lingering around the area or see a suspicious car around the area, record automatically ...
>
> Also, if tracking says delivered and u reach and pack isn't there : record street sign to front door (displaying house number) show yourself checking mailbox and any other areas pack could be (inside screen door, under doormat, side entrance).. knock on door at least three times and wait a while...
>
> All this will prevent us from losing volume for weeks to come 🤞🏾

58. The messages further show that on August 6, 2020, BROWN a/k/a "Reem" was detained by the Starkville Police Department. The App A communications showed that BROWN joined the group the day before by flying into Golden Triangle Regional Airport, which services Starkville. The messages show that on August 6, 2020, like the others, BROWN was driving a vehicle looking for packages at addresses that POPE sent to them. In the midst of that, POPE relayed to RENARD that BROWN was "pulled … over" and a package was seized from BROWN. The messages show that BROWN was released later that day, and that on the following day, BROWN resumed his efforts with the group of retrieving packages.

59. Historical cellular location data showed ELIZER's Phone in or around the Starkville, MS area during approximately August 2-9, 2020, and POPE's Phone in that same area during approximately August 4-8, 2020.

60. Historical cellular location data showed RENARD's Phone located in or around Tuscaloosa, Alabama during August 5-7, 2020. At various points on August 5 and again on August 7, phone location data for ELIZER's Phone and POPE's Phone showed the phones also located Tuscaloosa, Alabama. Consistent with that data, on August 4, 2020, RENARD sent an App A message to POPE stating "Y'all can bring the packs. We'll bust em here". Based on information learned during this investigation, I believe the "packs" referred to the packages that the group retrieved, and "bust em" referred to opening the packages and counting the money inside.

***August 10-16, 2020 – Cleveland, Ohio***

61. A review of the App A conversations showed the group then moved on to Cleveland, Ohio on or around August 10, 2020. Again, over the next several days, the two sets of App A messages show the same coordinated activity of identifying addresses where packages could be sent, receiving information about packages sent to some of those addresses, and then communicating about success or failure in retrieving the packages.

62. Victim K.L., who as discussed above was a 76-year-old victim of the grandparent/relative scam who sent U.S. currency to Indianapolis, also reported to Sgt. Brimer that he was instructed to send money to Ohio, which he did. The App A messages show that, on or about August 10 and 11, the group communicated about retrieving a package sent from Victim K.L. to an address in Cleveland, Ohio.

63. Historical cellular location data shows that POPE's Phone was located in or around Cleveland, Ohio from August 11-16, 2020; ELIZER's Phone from August 9-15, 2020 (with exceptions on August 12 and 13); and RENARD's Phone from August 11-14, 2020.

***October 28, 2020 – Myrtle Beach, South Carolina***

64. On October 28, 2020, Marshall (MN) County Sheriff's Deputies interviewed Victim C.G., approximately 81 years old, of Middle River, Minnesota, who stated that on or about October 27, 2020, after receiving call consistent with the grandparent/relative scam, she sent $9,000 an address in North Myrtle Beach, South Carolina.

65. On or about October 28, 2020, GLEMEAU arrived at the North Myrtle Beach address and picked up the package from the front porch of the residence. The lone passenger in the vehicle was later identified as Bianca Herrera.

66. GLEMEAU was approached by law enforcement and consented to the search the vehicle. Officers located in the factory equipped storage compartment located in the floor of the van and found the UPS package sent by Victim C.G. Inside the parcel, agents/officers located an assortment of magazines and brochures. As with other packages, one magazine was taped along all four (4) sides and inside that magazine was ninety $100 bills of U.S. currency ($9,000).

67. GLEMEAU agreed to be interviewed and gave a similar (false) account of activities as she had given to investigators in Indianapolis: that she was in the area looking at homes for investors, was staying in an AirBnB, and that this was the first time she had ever picked up a package. Additionally, GLEMEAU stated that she learned of the package from an individual with telephone number (516) 262-1308,[5] who first called her in August 2020. She said the individual called her the week before and told her to go to Myrtle Beach and await instructions. She then said that shortly after arriving in Myrtle Beach, she received a text to pick up the package.

[5] This was POPE's number, only with the last two digits transposed. The App A conversations and subpoenaed phone records showed POPE's number as (516) 262-1380.

GLEMEAU stated that she was to be notified later about how she would get paid, believing she .was to receive $200.00 for picking up the package and was to be reimbursed for the AirBnB rental.

68. Bianca Herrera also agreed to be interviewed. Herrera stated that she was friends with GLEMEAU, who also knows Herrera's cousin, POPE. Herrera provided POPE's telephone number as (516) 262-1308, the same number GLEMEAU provided for the individual who contacted her. Herrera stated that she and GLEMEAU met a few months ago in New York through POPE. Herrera stated that she and GLEMEAU were staying at an AirBnB with GLEMEAU's boyfriend (name not known) that POPE paid for. GLEMEAU and Herrera were supposed to stay at the AirBnB for the week and that POPE was coming to Myrtle Beach to meet them.

69. Historical cellular location data for ELIZER's Phone showed that her phone was located in and around Myrtle Beach, South Carolina from October 25-31, 2020, with the exception of portions of October 28 and 29. Further, RENARD's phone was located in or around Myrtle Beach, South Carolina from October 27-30, 2020. Historical cellular location data for POPE's phone show he was located in the State of New York during this time.

***November 19, 2020 – Richmond, Virginia***

70. On or about November 18, 2020, members of the FBI-Baltimore Field Office and Richmond (VA) Police Department learned that Victim A.J., approximately 83 years old, of Long Island, New York, was the victim of a grandparent/relative scam. She sent $9000 via FedEx to an address in Richmond, Virginia to be delivered on November 19, 2020.

71. That same day, the FBI, Henrico County PD, and Richmond PD personnel established surveillance on the Richmond address, which was a residence that appeared to be unoccupied and/or for-sale. The officers observed an individual exit a white Nissan Altima bearing Ohio license plate JAS2580 and take a FedEx package from the front porch of the residence.

Investigators followed the Nissan Altima to a Quality Inn hotel, where they found ELIZER had rented a room. Investigators contacted the room and found GLEMEAU and an adult male. The FBI Special Agent Jason Bender informed GLEMEAU that he knew she had previously picked up packages in Myrtle Beach and Virginia Beach.

72. Later, investigators learned that ELIZER had rented a room at another Quality Inn hotel in the area. Henrico County Detective Stuart VonCanon went to the room, knocked, and announced his identity. A male voice responded, and after a brief discussion about Detective VonCanon's identity and the nature of the visit, the unknown male refused to answer any additional questions. Det. VonCanon heard the sound of the chain-lock being put across the door and also heard an unknown female making a telephone call. The unknown male informed Det. VonCanon that he would not open the door and that he would not speak further to investigators without a lawyer and demanded that Det. VonCanon provide one. Det. VonCanon advised the unknown male that this was not how the process worked and that the unknown male was under no obligation to speak with law enforcement and that he was not under arrest or being detained.

73. The officers applied for and received a state search warrant for ELIZER's hotel room. Officers found Reggy Elizer and PRINCESS ELIZER in the room. Officers recovered, among other things, cellular phones, miscellaneous documents and receipts, including FedEx envelopes with shipping labels removed, and $1,000 and $2,000 money bands.

74. Reggy Elizer consented to the search of a vehicle in the parking lot outside. Inside the vehicle, law enforcement located five FedEx or UPS shipping containers (i.e., boxes or envelopes) that were addressed to various locations in Richmond, VA. One of the boxes contained several $1,000 and $2,000 money bands. (The parcel sent from Victim A.J. was not recovered.)

75. Sgt. Brimer made contact with at least one of the senders of the parcels found, Victim L.M., approximately 86 years old, of Lewiston, Illinois, who stated that after receiving a call consistent with the grandparent/relative scam, he sent $8,100 in U.S. currency to an address in or around Richmond.

76. Historical cellular location data for RENARD's Phone showed that on November 18, 2020 and November 19, 2020, the phone was in Glen Allen, Virginia, located approximately nineteen (19) minutes away by car from Richmond. Historical cellular location data for POPE's phone show he was located in the State of New York during this time.

***January 21, 2021 – Charleston, South Carolina***

77. On or about January 21, 2021, the FBI was notified of a package destined for Charleston, South Carolina, sent by Victim H.E. of Delmar, New York. The FBI learned that Victim H.E. was the victim of a grandparent/relative scam. Victim H.E. sent via UPS $9000 in U.S. currency, layered inside a magazine, to an address in Charleston, South Carolina.

78. Local law enforcement established surveillance near the address, which appeared to be occupied, and observed delivery of the package. UPS delivered the package through a slot in the door at the residence. Law enforcement waited to see if anyone approached the residence to inquire about the package. A short time later, law enforcement knocked on the door of the residence and obtained the package, which was not addressed to any of the residents. According to individuals inside, the house was recently rented. U.S. Currency was found inside the package.

79. While conducting surveillance, officers observed a silver Nissan Rogue, bearing GA license plate RYP5715, in the neighborhood near the address following the delivery. Investigators ran this license plate in a national law enforcement database and the vehicle was found to be registered to ELIZER.

80. Historical cellular location data for POPE's cellular telephone showed the phone in and around Charleston, South Carolina from January 18-21, 2021. Additionally, on or about January 21, 2021, POPE was stopped for speeding by the Charleston County Sheriff's Office and arrested on an extraditable warrant out of Sumner County, Tennessee for failure to appear—the same jurisdiction to which POPE was extradited following his arrest in Indianapolis. POPE was transferred to the custody of the Sumner County Sheriff's Office and remains in the Sumner County Jail.

* * *

81. Based on the foregoing, I submit there is probable cause to believe that the Defendants participated in a nationwide fraud conspiracy that involved conduct in Indianapolis, Indiana, as well as in the above-described cities at various times throughout 2020 and 2021. All of which was in violation of 18 U.S.C. §§ 1349 and 1341.

**E. <u>Evidence Regarding Use of Illegal Proceeds to Promote the Scheme</u>**

82. The evidence shows that proceeds of the grandparent/relative Mail Fraud scheme were paid to POPE, GLEMEAU, ELIZER, and BROWN for their roles in furthering the scheme. The evidence further shows that RENARD authorized and/or made such payments. For example:

a. On July 28, 2020, POPE sent a message to GLEMEAU and ELIZER that stated, "Either one of y'all got Uber or Lyft ? . . . Need to take one to meet Los for cash out." Based on my experience with this investigation to date, I believe POPE meant that he is meeting RENARD to deliver packages containing proceeds of the scheme (U.S. currency) and would be obtaining the group's share of those proceeds.

b. On July 23, 2020, POPE sent an App A message to GLEMEAU and ELIZER that stated, "We gotta go to a hotel tm .. i didn't get cashed out .. i made sure i got

y'all bread but i only have like 350 so not enough to cover for bnb". Based on my training and experience, I know that "bread" commonly refers to money, often U.S. currency. Based on my experience with this investigation to date, I believe POPE meant that, while he received payment for GLEMEAU and ELIZER ("i got y'all bread"), he did not receive enough from RENARD to pay for an AirBnB rental, so therefore the group needed to stay in a hotel.

c. On July 31, 2020, POPE asked RENARD in an App A message, "U gonna b able to cash me out jus now? We gonna touch road early today like 3 pm." RENARD responded, "Today?" And then stated, "You have the box cutter," to which POPE responded "Yea." Based upon these messages and the investigation to date, POPE appeared to be inquiring if RENARD was available that date to meet so POPE could be paid their portion of the illegal fraud proceeds and for operational expenses. RENARD then clarified the date and inquired about whether POPE had the box-cutter in order to open the money packages picked up by the group and count the currency.

d. On August 4, 2020, POPE asked RENARD, "u gonna cash me out for everything?" to which RENARD replied, "Not yet. Just landed." Shortly thereafter, POPE sent a message to GLEMEAU and ELIZER, "Couldn't get cashed out today but i got y'all for Saturday, today, and tm."

e. On August 8, 2020, POPE sent an APP A message to RENARD that stated, "U would have the bread to cash me out today or I gotta wait for it". Based on my experience with this investigation to date, I believe POPE is asking whether RENARD had the money to pay POPE his share of the proceeds.

83. In addition, the evidence shows that RENARD, and in turn POPE, further promoted the scheme by incentivizing activity that yielded more proceeds (e.g., identifying greater numbers of viable addresses) while threatening punishment for losses (e.g., instances where packages were lost to law enforcement or homeowners). For example:

a. On July 28, 2020, RENARD sent an App A message to POPE, "Need addys NOW." Approximately three hours later, RENARD stated to POPE, "Everything you slack on there's consequence. [next message] Rn we losing ground to other teams [next message] I can have all the respect in the world. Ppl I vouch for slacking off. My team look like a joke. They move to the next." Several messages later, RENARD stated, "I work they work y'all gotta show up." And then, several messages later, RENARD stated, "Been asking for 15 addys since yesterday [next message] It's all good go at your pace be comfortable [next message] Be happy." Based on these messages and my experience with this investigation, I understand that to mean that RENARD is criticizing POPE's team and their work ethic because they are lagging behind other groups picking up illegal proceeds and that if they do not improve, the person or persons who are in charge of the scheme will find other people to identify addresses and collect the packages with money in them.

(1) POPE replied, "Bro I understand everything u saying [next message] But I can't have niggas out here on some sitting duck shit .. 5 people out here n niggas get 3 a day? That shit not gonna work. [next message] Can't have niggas out here n not doing nothing." Based on these messages and my experience with this investigation, I understand that to mean that POPE is concerned that his people will be exposed to law enforcement, "sitting duck shit," and that it is not worth it only for his group of five individuals to receive three currency packages a day,

because the team is paid out of the proceeds of the number of packages they successfully retrieve.

(2) RENARD replied, "Y'all would be the reason volume slow down [next message] You want volume do the work!!!! [next message] Simple."

(3) POPE replied further, "Want to be able to have resources up front bro so I don't have to scramble on the fly to get cars out or find places to stay." RENARD then replied, "I'm trying to give you that." Then RENARD stated, "But I have to pay back the losses we take." Based upon the investigation to date, I believe that POPE was informing RENARD of his hope to be able to receive funding for the money pick-up operation up front instead of receiving money from RENARD after the fact to cover costs. I understand RENARD's reply to mean that he is trying to reach that goal but that he is responsible for paying back the leaders of the organization for packages that are lost or intercepted by law enforcement.

(4) RENARD then asked POPE, "How much for the whip and bnbs? [next message] 1 week, no losses." Based upon my training and experience, this message, and the investigation to date, I believe RENARD is following up on the earlier conversation about funding the operational costs up front, including vehicles ("whip") and lodging (AirBnB rentals referred to as "bnbs") for one week if the group does not sustain any losses.

(5) Several hours later, POPE sent RENARD a list of addresses in the Roanoke area and then stated, "955 for rooms 1500 for cash out."

b. On August 16, 2020, while in Indianapolis, POPE sent an App A message to GLEMEAU, ELIZER, BROWN, and one other that stated, "U think i should add an

incentive ? . . . If niggas get the 60 for sure by 10 niggas get a extra 25 on they packs." Later, as the team checked in with the number of addresses they have identified, POPE wrote, "Need 28 more and it's bonus time." Still later, after the group appears to have obtained 60 addresses, POPE then sends a message to RENARD, "got 60." Based on my experience with this investigation to date, I believe the references to "60" and "28 more" meant addresses to which packages could be shipped. I believe this because, based on the patterns established through the investigation, I know that the group typically began their stay in a particular city by identifying addresses to which packages can be shipped. August 16, 2020 was when the group first entered Indianapolis. Further, the group discussed the number of "addys" they had obtained leading up to 10:00pm on August 16, a term I know to refer to addresses. Finally, I also know that typically the group identifies approximately 30-50 addresses per city. Here, I believe POPE is offering an "incentive" of $25 per package received if the group obtains 60 addresses by 10:00pm.

* * *

84. Based on the foregoing, I submit there is probable cause to believe that the Defendants conspired to use proceeds of the fraud conspiracy to promote the conspiracy by paying for their "work" in the scheme and incentivizing them to undertake activities that increased the "volume" of the proceeds received, i.e., increased the places where victims of the grandparent/relative scam were told to send U.S. currency. All of which was in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(A)(i).

## REQUEST FOR SEALING

85. Because this investigation is ongoing, disclosure of the Criminal Complaint would seriously jeopardize the investigation by providing the targets an opportunity to destroy evidence,

change patterns of behavior, notify confederates, or flee from prosecution. Therefore, I respectfully request the Court to seal the Criminal Complaint, this Affidavit, and the resulting Arrest Warrants until further order of the Court.

## CONCLUSION

86. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the defendants, DARLENS RENARD, JASAUN POPE, PRINCESS ELIZER, JENNIFER GLEMEAU and KAREEM BROWN, have committed violations of 18 U.S.C §§ 1349 (Conspiracy to Commit Mail Fraud), 1341 (Mail Fraud), 1956(h) (Conspiracy to Commit Money Laundering), and 1956(a)(1)(A)(i) (Money Laundering-Promotion), as described herein.

87. Accordingly, I respectfully request that the Court issue the Criminal Complaint charging DARLENS RENARD, JASAUN POPE, PRINCESS ELIZER, JENNIFER GLEMEAU and KAREEM BROWN, issue Warrants for their arrest, and order the case sealed pending further order of the Court.

I swear under penalty of perjury that the foregoing is true.

Respectfully submitted,

/s/ Eric S. Sills

Eric S. Sills, Special Agent
IRS-Criminal Investigation Division

Subscribed and sworn to me, pursuant to Federal Rule of Criminal Procedure 4.1 by reliable electronic means.

Dated: March 15, 2021

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA